UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DWAYNE HOOSIER,

          Plaintiff

v.

WENDY LIU, *et al.*,

          Defendants.

_____/

Case No. 2:16-10688
District Judge Denise Page Hood
Magistrate Judge Anthony Patti

**REPORT AND RECOMMENDATION TO
GRANT THE MOTION FOR SUMMARY JUDGMENT FILED BY
DEFENDANTS WENDY LIU, KAREN RHODES, KIM FARRIS, AND
BADAWI ABDELLATIF (DE 81)**

I.     **RECOMMENDATION**

     For the reasons set forth below, the Court should **GRANT** Defendants Wendy Liu, Karen Rhodes, Kim Farris, and Badawi Abdellatif's Motion for Summary Judgment. (DE 81.)

II.    **REPORT**

     A.    **Relevant Factual Background**

     In February 2016, Plaintiff Dwayne Hoosier, a state prisoner who is proceeding *in pro per*, brought this lawsuit under 42 U.S.C. § 1983. (DE 1.) In March 2016, Chief Judge Hood referred all pretrial matters to me, including

preparation of a report and recommendation (R&R) on all dispositive motions.  (DE 8.)  <u>This is the fifth such R&R.</u>

Plaintiff's allegations are set forth in his verified Complaint.  (DE 1.)  He alleges claims of deliberate indifference to his medical needs in violation of the Eighth Amendment, as well as claims based on the Americans with Disabilities Act (ADA), the Rehabilitation Act and the Federal Tort Claims Act.  (*Id*.)  He names eleven defendants, all of whom are medical professionals involved in his treatment for ulcerative colitis and Raynaud's disease,[1] and all of whom he sues in their individual and official capacities for monetary damages and declaratory relief.  (*Id*.)  Seven of those defendants have since been dismissed from this lawsuit.  (See DEs 40, 53, 65, 71, 90.)  At issue here are the four remaining Defendants: Wendy Liu, N.P. and Karen Rhodes, D.O., medical providers at the G. Robert Cotton Correctional Facility (JCF); and, Kim Farris, P.A. and Badawi Abdellatif, M.D.,

---

[1] Ulcerative colitis is "a nonspecific inflammatory disease of the colon of unknown cause characterized by diarrhea with discharge of mucus and blood, cramping abdominal pain, and inflammation and edema of the mucous membrane with patches of ulceration[.]" https://www.merriamwebster. com/dictionary/ulcerative%20colitis#medicalDictionary (last visited January 3, 2019). Raynaud's disease is "a vascular disorder that is marked by recurrent spasm of the capillaries and especially those of the fingers and toes upon exposure to cold, that is characterized by pallor, cyanosis, and redness in succession usually accompanied by pain, and that in severe cases progresses to local gangrene[.]" https://www.merriamwebster.com/medical/Raynaud's%20disease (last visited January 3, 2019).

medical providers at the Macomb Correctional Facility (MRF).  (DEs 81-2, ¶ 2; 81-3, ¶ 2; 81-5, ¶ 2; 81-6, ¶ 2.)

### 1.    Plaintiff's treatment at JCF

The factual and procedural background has been extensively set forth in my prior R&Rs in this matter and need not be repeated in full here. In relevant summary, Plaintiff alleges he was originally diagnosed with ulcerative colitis on January 12, 2014, when a colonoscopy was performed at Allegiance Health Hospital (Allegiance) in Jackson, Michigan.  (DE 1 at 5, ¶ 20; DE 83 at 120-40[2].)  After the colonoscopy, the hospital sent Plaintiff to Dwayne Waters Health Center (DWH), where he received pain medication and additional treatment from January 13 to 17, 2014.  (DE 1, ¶¶ 28-30; DE 83 at 120-40.)

When he returned to JCF, NP Liu evaluated Plaintiff on multiple occasions, and he was prescribed numerous medications and advised to see "a gastrointestinal clinic at the prison on a regular basis."  (DE 1, ¶¶ 23-24; DE 83 at 141-97.)  Plaintiff alleges that he was also told that his colitis was "mild to moderate at the time and could be controlled if treated properly with steroids and other medications."  (DE 1, ¶ 31.)  Plaintiff states that he experienced blood loss, dizziness, pain, cramps, and incontinence every day.  (Id. ¶¶ 34-36, 53.)  NP Liu sent Plaintiff back to Allegiance

---

[2] DE 83, Exhibit A to Defendants' motion for summary judgment, contains portions of Plaintiff's medical records and has been filed under seal.  (DE 83; Text-only order dated 8/21/18.)

on February 12, 2014, after he complained of increased bleeding in his stool, where he underwent a blood transfusion, received intravenous (IV) antibiotics and pain medication, had another CT scan, and was evaluated by a gastroenterologist.  (*Id.* ¶¶ 38-44; DE 83 at 205-47; DE 81-3, ¶¶ 22-23.)   Plaintiff was transferred from Allegiance to DWH on February 14, 2014 for further treatment, and then discharged back to JCF on February 26, 2014.  (DE 1, ¶ 45; DE 83 at 248-94.)  After his return to JCF, NP Liu reevaluated Plaintiff multiple times and submitted a special request to MDOC's Regional Medical Officer (RMO), receiving approval for Ultram and for a consultation request ("407 request") for a repeat colonoscopy and urology consultation.  (DE 81-3, ¶¶ 24, 28-30; DE 83 at 295-98, 322-43.)

Plaintiff returned to DWH again on March 16, 2014, due to nausea, vomiting and dehydration. (DE 1, ¶ 47; DE 83 at 344-68.)  On March 18, 2014, he was discharged back to JCF at his own request (because he "state[d] he feels well" and felt that his pain "improved with Ultram").  (DE 83 at 344-68.)  Following his discharge, NP Liu continued to treat Plaintiff, including ordering labs, antibiotics, and Norco, following the gastrointestinal specialist's recommendations, and renewing Plaintiff's details (including continuous access to the toilet).  (DE 81-3, ¶¶ 31, 33-35, 38-39; DE 83 at 375-85, 397, 399-407, 410-452.)

On April 21, 2014, Nadeem Ullah, M.D., performed Plaintiff's second colonoscopy at Allegiance, which revealed mildly active ulcerative colitis.  (DE 83

at 454-62.) Following that colonoscopy, NP Liu continued to: reevaluate Plaintiff (following Dr. Ullah's recommendations), renew his medications, reorder labs and order follow-up appointments. (DE 81-3 ¶¶ 40-42, 44-46; DE 83 at 463-511.) Plaintiff was admitted to DWH on May 28, 2014 for IV steroids, and then sent to Allegiance on May 31, 2014 for another blood transfusion. (DE 81-3, ¶ 48; DE 83 at 522-26, 551-62.) Plaintiff then returned to DWH, where he continued to receive treatment until June 24, 2014, when he transferred back to JCF. (DE 81-3, ¶ 49; DE 83 at 590-600.) NP Liu then continued to reevaluate and treat Plaintiff through July 2014, and order medications and follow-up monitoring in accordance with recommendations from DWH. (DE 81-3, ¶¶ 49-57; DE 83 at 601-58.)

In August 2014, Plaintiff was administered an immunosuppressant, Cyclosporine, which NP Liu ordered at the request of Dr. William Borgerding. (DE 1, ¶ 79; DE 81-3, ¶¶ 58-63; DE 83 at 669-91.) NP Liu discontinued the Cyclosporine on September 10, 2014, due to side-effects and Plaintiff's complaints of increased stomach pain. (DE 81-3, ¶¶ 64, 66; DE 83 at 692-707.) Plaintiff then received his first Humira dose on September 17, 2014, and NP Liu continued to monitor Plaintiff and adjust his other medications as needed. (DE 81-3, ¶¶ 67-69; DE 83 at 708-38.) On October 22, 2014, NP Liu submitted a 407 request (and received approval) for a gastrointestinal specialist consultation. (DE 81-3, ¶¶ 75-76; DE 83 at 769-81.) Plaintiff saw the specialist, Dr. Allison Wood, on November 18, 2014. (DE 83 at

806-11.)  Plaintiff continued to receive additional Humira doses through December 2014 and NP Liu continued to reevaluate him and ordered medications in accordance with Dr. Wood's recommendations.  (DE 81-3, ¶¶ 72, 75-86; DE 83 at 754-887.)

Dr. Rhodes submitted a 407 request for a colonoscopy for Plaintiff on November 21, 2014, which was approved.  (DE 81-2, ¶ 8.)  Plaintiff underwent another colonoscopy on December 17, 2014, after which Dr. Wood recommended IV iron "if possible" and to "[e]ither increase to Humira 80 mg q week or change to Remicade 10 mg/kg."  (DE 83 at 904-05.)  NP Liu continued to evaluate Plaintiff; she also requested approval for an IV infusion of Remicade and Iron Dextran.  (DE 81-3, ¶¶ 89-92, 96, 98; DE 83 at 906-83.)  After Remicade had been approved, but not yet ordered due to Plaintiff's pending transfer to another facility, he continued to receive Humira injections and NP Liu continued to monitor him and provide medications.  (DE 81-3, ¶¶ 96-97, 99; DE 83 at 972-73, 976-77.)  NP Liu subsequently cancelled Plaintiff's pending request for IV infusions because it would delay his transfer to another facility.  (DE 81-3, ¶ 100; DE 83 at 984-85.)  NP Liu noted that Plaintiff was "expected to transfer within a few days" and that "[w]hen the next facility is known, [she] will either call report or send lengthy email to inform next facility of his problems and course."  (DE 83 at 985.)  Plaintiff was first going to be transferred to Bellamy Creek Correctional Facility (IBC) on January 15, 2015,

but was instead transferred to MRF on February 12, 2015.  (DE 83 at 986-91, 1040-42.)

On January 22, 2015, Dr. Rhodes evaluated Plaintiff for complaints of gastrointestinal pain, advised him to continue using Protonix and noted a plan to start Remicade infusions.  (DE 81-2, ¶ 11; DE 83 at 1007-1012.)  The following day Plaintiff received another Humira dose, and also subsequently received oral iron tablets to comply with Dr. Wood's recommendation until the IV iron treatment began, followed by another Humira dose on February 10, 2015.  (DE 81-2, ¶¶ 13-14; DE 83 at 1015, 1029-39.)

### 2.    Plaintiff's transfer to MRF

On February 12, 2015, Plaintiff transferred from JCF to MRF.  (DE 83 at 1040-42.)  NP Liu sent an email report regarding Plaintiff to PA Tumada and MDOC HUM Janet Nixon at MRF, and Dr. Rhodes indicated in a February 13, 2015 chart update that she intended to continue Plaintiff's prescriptions, including Norco, which had been approved through February 19, 2015, but that he transferred to MRF before the Norco prescription was renewed.  (DE 81-2, ¶ 16; DE 81-3, ¶ 105; DE 83 at 1050-53.)  Following his transfer, Plaintiff continued to receive Humira doses through April 2015, as well as his other medications, Dr. Abdellatif renewed all of his prescriptions and evaluated his complaints, and a 407 request for Plaintiff to have a follow-up appointment with Dr. Wood was approved.  (DE 81-5 ¶¶ 3, 5-7; DE 83

at 1056-57, 1083-86, 1092-94, 1122-25, 1131-45, 1163-65.)  Plaintiff had a follow-up appointment with Dr. Wood on April 3, 2015, and received additional Humira doses on April 7 and April 14, 2015.  (DE 83 at 1146-65.)  As of April 15, 2015, Dr. Wood had not finalized her report.  (DE 81-5, ¶ 8; DE 83 at 1166-67.)

On April 20, 2015, Dr. Abdellatif evaluated Plaintiff for complaints of pain in his left hand, presumably related to his Raynaud's disease, ordered Ultram for his pain and advised him to keep his hand and fingers warm and to notify healthcare if his condition changed.  (DE 81-5, ¶¶ 8-9; DE 83 at 1168.)  Plaintiff reported two days later that his left hand felt better, and Dr. Abdellatif noted that both hands were the same temperature and color and he again advised Plaintiff to keep his hand and fingers warm.  (DE 81-5, ¶ 10; DE 83 at 1171-72.)  On May 20, 2015, Dr. Abdellatif reviewed Dr. Wood's final report from Plaintiff's April 3, 2015 visit, which noted that Plaintiff's ulcerative colitis did not respond to Humira and recommending Remicade infusion treatment instead, and accordingly he ordered Remicade and lab work in preparation for the treatment.  (DE 81-5, ¶¶ 11-12; DE 83 at 1178-86.)  Plaintiff started Remicade treatment on May 27, 2015, and Dr. Abdellatif discontinued the Humira injections and adjusted Plaintiff's other medications accordingly.  (DE 81-5, ¶¶ 13-15; DE 83 at 1187-95.)

PA Farris first evaluated Plaintiff during a chronic care appointment on June 12, 2015, noted his ulcerative colitis and Raynaud's disease were stable, ordered him

to continue with his medications and IV therapy, to increase his fluid intake and activity level, and to kite for medical care as needed.  (DE 81-6, ¶ 3; DE 83 at 1196-1202.)   PA Farris also noted, with respect to Plaintiff's Raynaud's disease, "intermittent bluish discoloration" on Plaintiff's right upper extremity and that it was "cool to touch and weakness," and ordered a trial on a low dose of Norvasc.  (*Id.*)  On August 27, 2015, PA Farris evaluated Plaintiff's complaint regarding his Raynaud's disease during a scheduled provider visit, increased his dose of Norvasc and ordered a detail for TED stockings, a basin to soak his feet, and an order for tennis shoes.  (DE 81-6, ¶ 7; DE 83 at 1242-46.)  Dr. Abdellatif and PA Farris continued to renew Plaintiff's medications, order follow-up lab tests, provide accommodations and monitor his condition.  (DE 81-5, ¶¶ 16-30; DE 81-6, ¶¶ 5-16; DE 83 at 1247-98.)

### B.   Procedural Background

The Court has previously dismissed Plaintiff's claims against Defendants Shi-Yu Tan, Rickey Coleman, Steven Bergman, Vicki Carlson and William Borgerding, D.O. without prejudice for failure to exhaust administrative remedies. (DEs 40, 53, 65, 71.)  In addition, the Court granted partial summary judgment to NP Liu and dismissed Plaintiff's claims that NP Liu: (1) failed to provide "reasonable accommodations" to Plaintiff in violation of the ADA and the Rehabilitation Act; (2) violated the Eighth Amendment by cancelling accommodations Plaintiff was

receiving; and (3) inflicted emotional distress, in violation of the Federal Tort Claims Act (FTCA), based on failure to exhaust administrative remedies.  (DEs 40, 53.) Plaintiff's remaining claims alleged against NP Liu are that: she violated Plaintiff's Eighth Amendment rights "by changing Plaintiff's very necessary medical medication" (DE 1, ¶ 161); she "cancel[ed] certain medications needed" (*Id.* ¶ 165); she (along with Dr. Borgerding) "fail[ed] to inform Plaintiff of adverse consequences of medication [cyclosporine]"  (*Id.* ¶ 171); and, she "showed negligence by not properly address[ing] Plaintiff's medical needs in a timely fashion." (*Id.* ¶¶ 169-70.)  Finally, I also recently recommended that the motion for summary judgment filed by Defendants Xue and Sears should be granted and Plaintiff's claims against those defendants be dismissed.  (DE 90.)

### C.    Instant Motion

The four remaining defendants, NP Liu, Dr. Rhodes, PA Farris, and Dr. Abdellatif, now bring this motion under Rule 56 asking the Court to grant summary judgment in their favor.  (DE 81.)  They first argue that Plaintiff failed to exhaust his administrative remedies as to all of his claims against them.  (*Id.* at 28-32.)  They further argue that, even if Plaintiff did exhaust all of his claims, his ADA and Rehabilitation Act claims still fail because there is no individual liability under the ADA and, as employees of Corizon and not the State, they have no "official capacity" on behalf of any public entity.  (*Id.* at 32-34.)  Finally, Defendants argue

that there is no evidence to support Plaintiff's Eighth Amendment claims against them.  (*Id.* at 34-42.)

Plaintiff filed a response opposing Defendants' summary judgment motion, arguing generally that he has exhausted his administrative remedies as to his claims against Defendants Liu and Rhodes and that those defendants have demonstrated deliberate indifference to his serious medical needs by unreasonably delaying sending Plaintiff to an outside specialist or in treating his ulcerative colitis.  (DE 87 at 4-9.)  Plaintiff also argues that he exhausted his claims against Defendants Farris and Abdellatif through the three grievances he filed at MRF, and that these defendants have violated his Eighth Amendment rights by failing to provide the prescribed medical treatment as ordered by the outside specialist. (*Id.* at 9-10.) Finally, Plaintiff argues that he has stated a claim against all Defendants under the ADA and Rehabilitation Act, and that Defendants are not entitled to qualified immunity.  (*Id.* at 10-11.)   I note however, that Defendants did not assert a qualified immunity defense.

Defendants filed a reply brief in which they initially concur with the argument made in MDOC Defendants Xue's and Sears' reply brief in support of their previous motion for summary judgment, *i.e.,* that Plaintiff's response brief was untimely and contains inadmissible summary judgment evidence.  (DE 89 at 2, citing DE 88 at 2.) Defendants go on to re-assert that Plaintiff failed to exhaust his available

administrative remedies against them, that there is no dispute as to any material fact regarding Plaintiff's deliberate indifference allegations, and that his claims amount to nothing more than a disagreement with the course of treatment. (*Id.* at 2-8.) Defendants also contend that Plaintiff cannot sue private individuals for violations of the ADA or Rehabilitation Act, and so those claim fail. (*Id.* at 8.)

### D. Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no *genuine dispute* as to any *material fact* and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A fact is "material" if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute cannot be "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248.

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted). But "[o]nce the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also* Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to

12

properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion."). And the nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

To that end, any party asserting that a fact is or is not "genuinely disputed must support their assertion by (A) citing to particular parts of materials in the record, including . . . affidavits or declarations, . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute" of fact, or showing that the adverse party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A cited affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. *Id.* at 56(c)(4). While unsworn declarations generally cannot be used to support or oppose a motion for summary judgment, there is a statutory exception. *Pollock v. Pollock*, 154 F.3d 601, n.20 (6th Cir. 1998); 28 U.S.C. § 1746. Unsworn declarations can

13

substitute for a conventional affidavit if the statement contained in the declaration is made under penalty of perjury, certified as true and correct, signed and dated.  *Id.*

Ultimately, summary judgment is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact.  *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")  Courts must view "all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys. v. Mt. Hawley Ins.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

Finally, the fact that Plaintiff is *pro se* does not lessen his obligations under Rule 56.  Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law."  *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  In addition, "[o]nce a case has progressed to the summary judgment stage . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).

### E.   Analysis

#### 1.   Procedural issues

MDOC Defendants Xue and Sears previously argued in support of their own summary judgment motion that Plaintiff's response to their motion was untimely and that Attachment A to his response (DE 86 at 13-17) contains improper summary judgment evidence because it is inadmissible hearsay. (DE 88 at 2.) The Corizon Defendants now seek to incorporate those arguments "by reference as if fully restated herein" and urge the Court to "disregard Plaintiff's untimely Response and the inadmissible evidence he submitted," but without specifically identifying what that "inadmissible evidence" is. (DE 89 at 2.) First, arguments such as this, which are undeveloped, may be treated as waived. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation and internal quotation marks omitted). In any event, for the same reasons the Court rejected MDOC Defendants Xue's and Sears' procedural objections (DE 90 at 9-11), the Court rejects the Corizon Defendants' procedural objections here.

### 2. Exhaustion of Administrative Remedies

#### a. Prison Litigation Reform Act

Under the Prison Litigation Reform Act (PLRA), a prisoner may not bring an action "with respect to prison conditions under section 1983 of this title, or any other

Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted this provision to address the "outsized share" of prisoner litigation filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones*, 549 U.S. at 203. Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211. The prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir.

16

1999).  The prisoner "may not exhaust his administrative remedies during the pendency of the federal suit."  *Id.* (citations omitted); *see also Woodford*, 548 U.S. at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .").  However, "inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.  Instead, failure to exhaust administrative remedies is an affirmative defense under the PLRA.  As such, Defendants bear the burden of proof on exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012) ("A PLRA defendant bears the burden  of proving that a PLRA plaintiff has not exhausted his administrative remedies.").

### b.    Grievance Procedure at the MDOC

Pursuant to its Policy Directive 03.02.130, dated July, 9, 2007, the administrative remedies available at the MDOC are as follows.  First, the inmate must attempt to resolve any issue with the staff member involved within two business days of becoming aware of a grievable issue.  (DE 35-2, ¶ P.) If the issues are not resolved within five business days, the inmate may file a Step I grievance using the appropriate form.  (*Id.*)  "Dates, times, places, and names of all those involved in the issue being grieved are to be included."  (*Id.* at ¶ R.)  The inmate

should receive a response within fifteen business days of filing the grievance.  (*Id.* at ¶ X.)

If the inmate is dissatisfied with the disposition of the grievance, or does not receive a response by ten business days after the due date, he or she may file a Step II grievance using the appropriate form.  (*Id.* at ¶ BB.)  As with Step I, a response to the Step II grievance should be issued within fifteen business days.  (*Id.* at ¶ CC.) Similarly, if the inmate is dissatisfied with the Step II response or does not receive a response by ten business days after the response was due, he or she may file a Step III grievance.  (*Id.* at ¶ FF.)  The matter is fully exhausted after the disposition of the Step III grievance. *Surles*, 678 F.3d at 455 ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted.").

### c.    Exhaustion as to Defendants NP Liu and Dr. Rhodes

Defendants NP Liu and Dr. Rhodes were employed by Corizon at JCF during the relevant time period.  (DE 81-2, ¶ 2; DE 81-3, ¶ 2.)  As this Court explained in its prior R&Rs, Plaintiff filed six Step III grievance appeals while incarcerated at JCF, but he successfully exhausted only two of those grievances:

1. **JCF-14-01-0059-12d1 ("0059"):** Filed on January 3, 2014, stating an incident date of December 30, 2013, and complaining that Plaintiff has been having problems with his stomach and rectal and anal pain with continuous blood/blood clots in his stool since August 2013 and that he wants to see a specialist.

2. **JCF-14-05-1207-12f ("1207"):** Filed on May 19, 2014, stating an incident date of May 16, 2014, and complaining that Plaintiff sent a kite to

18

healthcare on May 15, 2014 requesting renewal of medication and his bathroom detail and complaining of pain in the rectal area and stomach, and that the May 16th kite response was that he would have an appointment with the medical provider in about a week, which he claims is unacceptable.

(DE 26-1 at 14-24; DE 40 at 13-18; DE 65 at 9-10.)  Therefore, Plaintiff must have exhausted his claims against Defendants NP Liu and/or Dr. Rhodes in these two grievances, or not at all.

### i.     Plaintiff's ADA and Rehabilitation Act claims against Dr. Rhodes

Plaintiff alleges that and Defendants NP Liu and Dr. Rhodes (as well as Dr. Abdellatif and PA Farris) failed to provide a reasonable accommodation in violation of the ADA, the Rehabilitation Act the Eighth Amendment. (DE 1, ¶ 162.)  This Court previously found that Plaintiff failed to exhaust his claims against NP Liu for failure to make reasonable accommodations and cancellation of accommodations in violation of the ADA, the Rehabilitation Act and the Eighth Amendment.  (DE 40 at 14-15; DE 53 at 4-6.) Specifically, Grievance JCF-2015-01-0189-12i ("0189") was found to be "the only grievance [against NP Liu filed at JCF] regarding the alleged failure to make reasonable accommodations under the ADA and Rehabilitation Act, and the similar claim that the cancellation of his accommodations violated the Eighth Amendment[,]" and that grievance was rejected as untimely at Step II, and thus was not properly exhausted.  (DE 40 at 14-15; DE 53 at 5.) Grievances 0059 and 1207, the only exhausted grievances filed by Plaintiff at JCF,

do not contain any allegations regarding reasonable accommodations or cancellation of accommodations under the ADA, Rehabilitation Act or the Eighth Amendment. (See DE 26-1 at 14-24.)   Accordingly, like NP Liu, Dr. Rhodes is entitled to summary judgment on Plaintiff's claims for failure to make reasonable accommodations or cancellation of accommodations in violation of the ADA, the Rehabilitation Act or the Eighth Amendment, based on the failure to exhaust administrative remedies.

### ii.     Plaintiff's remaining claims against NP Liu

Plaintiff's remaining claims against NP Liu are that she violated his Eighth Amendment rights "by changing Plaintiff's very necessary medical medication" (DE 1, ¶ 161) and that Liu "cancel[ed] certain medications needed[.]" (*Id.* ¶ 165.)  He also claims that NP Liu (along with Dr. Borgerding) "fail[ed] to inform Plaintiff of adverse consequences of medication [cyclosporine][.]" (*Id.* ¶ 171.)  Finally, Plaintiff broadly claims that NP Liu "showed *negligence* by not properly address[ing] Plaintiff's medical needs in a timely fashion." (*Id.* ¶¶ 169-70 (emphasis added).)

Although Plaintiff's 43-page handwritten complaint is somewhat difficult to follow, the factual portion of Plaintiff's complaint generally (and benignly) discusses NP Liu's involvement in his diagnosis of and treatment for ulcerative colitis at JCF, including: that he "first started showing symptoms of colitis August 13 when N.P. Liu … tried to catch [the] illness in the early stages" (DE 1 ¶ 46); that

20

NP Liu "put in for a colonoscopy by a 407 form" in January 2014 (*id.* ¶ 5); she "ordered a STAT emergency ambulance call due to [Plaintiff's] vital signs" in February 2014 (*id.* ¶ 39); that NP Liu (and Dr. Borgerding) placed Plaintiff "on a series of different medications i.e. steroids, antibiotics and other medications[,] all I.V. meds" in May 2014 (*id.* ¶¶ 69-70); that NP Liu referred him to mental health counseling as he requested in July 2014 (*id.* ¶ 54); and, that she "requested and gotten [sic] approved [for Plaintiff] both I.V. infusion for Remicade and I.V. Iron Dextron" in December 2014 (*id.* ¶¶ 115-16, 120).

However, Plaintiff only *complains* that NP Liu (and Dr. Borgerding) placed Plaintiff on the drug cyclosporine starting around June 24, 2014 through September 2014 (DE 1 ¶¶ 70, 79-80, 87, 171), and that NP Liu cancelled several of his medical details as well as his prescription for Remicade and IV iron in January and February 2015 pending his transfer to another facility. (*Id.* ¶¶ 123-33, 148, 161, 165.) Similarly, in his response brief, he complains with respect to NP Liu that he "was not stable when defendant[s] Liu and Rhodes changed and cancelled [his] medical requirements in 2015" and his treatment with Remicade, as recommended by Dr. Wood in late November 2014. (DE 87 at 7-9, 16-17; *see also* DE 81-4 at 18 ("So then something came up. We had fell out or whatever or she [NP Liu] had fell out with me. She just kind of flipped on me, and the next thing you know they trying to – she canceled all of my IV iron, my REMICADE.").)

21

However, these claims against NP Liu post-date the incident dates in Grievances 0059 (December 30, 2013) and 1207 (May 16, 2014), and thus those grievances could not have exhausted Plaintiff's administrative remedies for claims occurring after those incident dates. *See Ross v. County of Bernalillo*, 365 F.3d 1181, 1187 (10th Cir. 2004) ("A grievance obviously cannot exhaust administrative remedies for claims based on events that have not yet occurred."), *overruled on other grounds in part by Jones v. Bock*, 549 U.S. 199, 223 (2007).  Plaintiff did not exhaust any grievance complaining of NP Liu's behavior during that time period at issue— regarding placing Plaintiff on cyclosporine in June or August 2014[3] and cancelling Plaintiff's treatment with Remicade infusions and IV Iron in January or February 2015.[4]

Thus, no properly exhausted grievances align with the allegations in the Complaint against NP Liu, and she is entitled to summary judgment.  *See Ford v. Martin*, 49 F. App'x 584, 585 (6th Cir. 2002) ("Ford failed to exhaust the administrative remedies for his claims numbered 2-3.  Although Ford provided

---

[3] Plaintiff's complaint alleges that he was administered cyclosporine starting in June 2014, but NP Liu's affidavit and the medical record establish that he was first administered cyclosporine in August 2014.  (*Compare* DE 1, ¶¶ 79-81 *with* DE 81-3 ¶¶ 61-62 and DE 83 at 669-707.)

[4] Plaintiff did file a Step I grievance, JCF-2015-01-0189-12i, against NP Liu on January 20, 2015, alleging that she had "changed/deleted" medical orders without his having seen a physician (DE 26-1 at 60), but, as this Court previously found, Plaintiff failed to properly exhaust that grievance.  (DE 40 at 14-15.)

copies of three grievances to the district court, these grievances did not raise the same issues as those asserted in the second, third, or fourth claims of Ford's § 1983 complaint. Hence, the district court properly dismissed the complaint.").

### iii.    Plaintiff's remaining claim against Dr. Rhodes

Plaintiff's only remaining claim against Dr. Rhodes is that she violated his Eighth Amendment rights "by changing Plaintiff's very necessary medical medication." (DE 1 ¶ 161.) The only supporting factual allegations in Plaintiff's Complaint regarding Dr. Rhodes are that Dr. Rhodes told Plaintiff sometime around December 2014 that she did not know where the Remicade infusions ordered by the outside specialist would be performed, even though Plaintiff subsequently learned that they could be performed at DWH, and that she administered Humira injections to Plaintiff in the December 2014/January 2015 time period. (DE 1, ¶¶ 120-23.) Plaintiff did not exhaust any grievance complaining of Dr. Rhodes' behavior during that time period—December 2014 through January 2015. (See DE 26-1.) Rather, as with NP Liu, Dr. Rhodes' alleged actions post-date the stated incident dates in the only two exhausted grievances, 0059 (December 30, 2013) and 1207 (May 16, 2014). In fact, Dr. Rhodes provided sworn, undisputed testimony that she did not even treat Plaintiff between September 25, 2013 and August 25, 2014. (DE 81-2 ¶¶ 5-6.) Accordingly, because of the undisputed absence of a treating relationship during this relevant time frame, Grievances 0059 and 1207 could not have exhausted

any of Plaintiff's claims against Dr. Rhodes.  Therefore, Dr. Rhodes is entitled to summary judgment.

### iv.　　　Grievances 0059 and 1207

Turning to the two grievances Plaintiff did exhaust at JCF—Grievances 0059 and 1207—I note that neither grievance specifically names Defendants Liu or Rhodes, or indeed any particular medical provider.  Rather, both grievances are filed against "all JCF health Care staff, H.U.M., Doctors, Nurses, and Corizon."  (DE 26-1 at 17, 23.)    A prisoner must specifically mention the involved parties in the grievance to alert the prison officials to the problems so that the prison has a chance to address the claims before they reach federal court.  *See Bell v. Konteh*, 450 F.3d 651, 653 (6th Cir. 2006); *see also Vandiver v. Martin*, 48 F. App'x 517, 519 (6th Cir. 2002) ("The issues [plaintiff] may raise, and the defendants he may name, in his lawsuit are limited to the specific issues raised, and the specific individuals mentioned, in his grievance.").  However, as this Court has previously explained:

> While some courts have found that a generalized referral to "health care services," in combination with specific recitations of the date(s) and other identifying information, such as reference to specific kites, may be sufficient to identify the target(s) of the grievance for purposes of exhaustion, even if those individual defendants are not named in the grievance, *see, e.g., Burton v. Kakani*, No. 09-10893, 2009 WL 3101046, at *2-3 (E.D. Mich. Sept. 23, 2009), others have found that a broad reference to "health care staff," without more specific allegations in the grievance regarding the defendants, is insufficient is exhaust administrative remedies as to particular defendants. *See, e.g., Solomon v. Mich. Dept. of Corrs.*, No. 2:10-CV-59, 2011 WL 4479300,

24

at \*3 (W.D. Mich. Aug. 31, 2011) *report and recommendation adopted*
by 2011 LW 4479407 (Sept. 27, 2011).

(DE 65 at 11.)  As stated above, Dr. Rhodes provided sworn, undisputed testimony

that she did not even treat Plaintiff between September 25, 2013 and August 25,

2014 (DE 81-2 ¶¶ 5, 6), and thus she cannot have been the subject of either grievance.

And, while NP Liu admittedly provided care to Plaintiff during the time periods

stated in Grievances 0059 and 1207, Plaintiff has not pointed to "more specific

allegations in the grievance[s]" related to NP Liu that would have provided her fair

notice that the grievances were directed at her.  Further, as to Grievance 1207, this

Court previously found that grievance "is *unmistakably, directly related* to the

Complaint's allegations concerning *Xue's* declining to send Plaintiff directly to a

medical provider in May 2014. Indeed, *Xue's* response to Plaintiff's kite

immediately preceded, and was the impetus for, the filing of that grievance."  (DE

40 at 24 (emphases added).)  Neither Plaintiff's complaint nor Grievance 1207

alleges that NP Liu was involved in that kite response.  Therefore, Plaintiff has failed

to exhaust his administrative remedies as to any claims against NP Liu or Dr.

Rhodes, and those defendants are entitled to summary judgment.

However, even giving Plaintiff the benefit of the doubt that NP Liu is within

the ambit of those medical professionals against whom Grievances 0059 and 1207

were alleged, and that Plaintiff thus arguably exhausted his administrative remedies

25

as to the allegations asserted in those grievances, his Eighth Amendment claims

against NP Liu nevertheless fail, for the reasons explained in Section E.3. below.

### d.    Exhaustion as to Defendants Farris and Abdellatif

Defendants PA Farris and Dr. Abdellatif were employed by Corizon at MRF

during the relevant time period.  (DE 81-5, ¶ 2; DE 81-6, ¶ 2.)

Plaintiff filed three Step III grievance appeals while incarcerated at MRF:

1. **MRF-15-04-0759-12e1 ("0759"):** Filed on April 20, 2015, and
complaining that Plaintiff was never called out to see a medical provider
about pain medications and setting up an offsite procedure (Remicade)
following an off-site appointment with a GI specialist on April 3, 2015.

2. **MRF-15-05-0804-12d1 ("0804"):** Filed on April 23, 2015, and
complaining that Dr. Abdellatif should have sent Plaintiff to the hospital
for an MRI, CT, etc. on or about April 20, 2015 regarding his complaints
of "severe pain, numbness, coldness, poor circulation, purple and blueness,
along with loss of feeling in both left arm, hand, fingers and left foot[.]"

3. **MRF-15-08-1489-12d ("1489"):** Filed on August 6, 2015, and
complaining that PA Farris failed to send Plaintiff to the hospital for an
MRI, CT, etc. or to a "QHP" for complaints of "numbness, continuous
pain, and lack of circulation in both left hand, arm and left foot" on or
about August 5, 2015.

(DE 26-1 at 29-39, 62-65.)  All three grievances were exhausted through Step III of

the grievance process.  (*Id.*)  Plaintiff must have exhausted his claims against

Defendants PA Farris and/or Dr. Abdellatif in these three grievances, or not at all.

### i.    ADA and Rehabilitation Act claims against PA Farris and Dr. Abdellatif

Plaintiff alleges that and Dr. Abdellatif and PA Farris (along with NP Liu and Dr. Rhodes) failed to provide a reasonable accommodation in violation of the ADA, the Rehabilitation Act and the Eighth Amendment. (*Id.* ¶ 162.)  However, none of the three grievances exhausted at MRF during the relevant time period cover claims based on the ADA or Rehabilitation Act. (See DE 26-1 at 29-39, 62-65.) Accordingly, Plaintiff has failed to exhaust his ADA and Rehabilitation Act claims against Dr. Abdellatif and PA Farris, and they are entitled to summary judgment on these claims for failure to exhaust administrative remedies.

### ii.        Plaintiff's remaining claim against Dr. Abdellatif

Plaintiff only remaining claim against Dr. Abdellatiff is that the doctor violated Plaintiff's Eighth Amendment rights because he "did not properly treat Plaintiff for [his] serious medical needs or disabilities by not doing a proper follow up as required by policy[.]" (DE 1, ¶ 167.)  In his complaint, Plaintiff generally alleges that he "saw specialist Woods [sic] on 4-3-15 and paperwork was sent back for pain meds and a treatment plan, [but] Plaintiff was never given anything for pain and still hasn't until this day" and that his "treatments for the Remicade did not start until 5-27-15[.]" (*Id.* ¶ 146-47.)  He also alleges that Dr. Abdellatif treated him on or about April 23, 2015 for complaints of extreme pain and loss of feeling in his left hand and foot, and that Dr. Abdellatif "looked at [his] hand and said its [sic] Raynaud's[,] gave Plaintiff 1 35 mg Ultram which did nothing and sent Plaintiff

back to unit" and that he wrote a grievance about "the lack of care."  (DE 1, ¶¶ 99-101.)

On April 20, 2015, Plaintiff filed Grievance 0759 against "the healthcare staff at Macomb Regional Facility" claiming that he returned from an offsite specialist appointment on April 3, 2015 and that he was instructed to follow up regarding the new treatment plan/procedure, but was not seen, and requesting to be seen by "P.A. or Dr." for treatment and scheduling of offsite procedure.  (DE 26-1 at 32.)  Although Dr. Abdellatif was not specifically named in Step I of the grievance, he was interviewed for the Step I grievance response, and he explained that the specialist had not sent an official report or recommended future plan of care until May 20, 2015, and thereafter, pre-Remicade labs were collected and Plaintiff then received his first Remicade infusion on May 27, 2015, and second dose on June 10, 2015.  (*Id.* at 33.)  Thus, although this grievance does not name an individual in Step I of the grievance, Dr. Abdellatif was interviewed for the grievance response and thus he had "fair notice" that he was among the subjects of the grievance.  *See Burton*, 2009 WL 3101046, at *2-3.   Accordingly, reading Plaintiff's complaint liberally, Grievance 0759 appears to exhaust Plaintiff's claim against Dr. Abdellatif that he "saw specialist Woods [sic] on 4-3-15 and paperwork was sent back for pain meds and a treatment plan, [but] Plaintiff was never given anything for pain."  (DE 1, ¶ 146.)

Further, Grievance 0804, filed on April 23, 2015, specifically names Dr. Abdellatif and appears to exhaust Plaintiff's claim that Dr. Abdellatif did not properly treat Plaintiff's medical needs in April 2015 regarding his complaints of extreme pain and loss of feeling in his left hand and foot. (DE 1, ¶¶ 99-101; DE 26-1 at 35-39.)

Accordingly, Plaintiff appears to have exhausted his Eighth Amendment claims against Dr. Abdellatif regarding an alleged delay in providing Remicade and IV Iron and in treating Plaintiff's complaints of hand and foot pain in April 2015. But, to the extent Plaintiff's complaint alleges any claims against Dr. Abdellatif arising out of conduct that occurred *after* April 2015, those claims would not have been exhausted and Dr. Abdellatif should be entitled to summary judgment on those claims.

### iii. Plaintiff's remaining claim against PA Farris

Plaintiff claims that PA Farris violated his Eighth Amendment rights by "not treating [his] serious pain and medical needs and not following the outside Dr.'s orders to give pain medication, and the IV iron infusions requested by outside doctor." (DE 1 ¶ 166.) Plaintiff alleges that he "switched from Dr. Abdellatif Defendant to P.A. Kim Farris" and "made several request[s] for pain medication with the ulcerative colitis and the Raynaud's and [he] is only given Tylenol which does nothing." (DE 1, ¶¶ 105-06.) He claims that he "asked P.A. Kim Farris to

allow [him] to see a neurologist and a follow up with the G.I. specialist who [he] hasn't seen since [his] grievance about following treatment plan that was ordered in 12-2014[,]" but that PA Farris kept telling him that she had to ask Dr. Abdellatif about pain medication and seeing the specialist. (*Id.* ¶¶ 107-10, 152.)

According to PA Farris' affidavit and the medical record, she first began treating Plaintiff in June 2015. (DE 81-6 at 3; *see* DE 83 at 1196-1202.) Plaintiff does not dispute this. Accordingly, Grievances 00759 and 0804, alleging incident dates in April 2015, cannot apply to Plaintiff's claims against PA Farris because both of those grievances pre-date the time PA Farris started treating Plaintiff. However, Grievance 1489, filed on August 6, 2015, specifically names PA Farris and complains that Plaintiff would like to be seen by a neurologist, have a CT scan or MRI and effective treatment for numbness, continuous pain and lack of circulation in his left hand, arm and foot. (DE 26-1 at 65.) Grievance 1489 thus appears to exhaust Plaintiff's claims against PA Farris regarding treatment for his hand and foot pain and numbness in August 2015. However, Grievance 1489 does not contain any allegations regarding treatment for ulcerative colitis and thus fails to exhaust any claims against PA Farris regarding that condition. *See Ford*, 49 F. App'x at 585.

**In sum:**

- Dr. Rhodes is entitled to summary judgment because Plaintiff has failed to his exhaust administrative remedies regarding any claims against her;

- NP Liu is entitled to summary judgment on all claims asserted against her, except to the extent the allegations exhausted in Grievances 0059 or 1207 state a claim against her, if she is even within the ambit of the broad category of "health care staff" and/or "nurses" he identifies (DE 26-1 at 17, 23);

- Plaintiff exhausted his administrative remedies regarding the claims asserted against Dr. Abdellatif as identified in Grievances 0759 and 0804; and

- Plaintiff exhausted his administrative remedies regarding the claim asserted against PA Farris as identified in Grievance 1489 only regarding treatment for his hand and foot pain and numbness in August 2015, but not regarding treatment for his colitis.

### 3.     Eighth Amendment claims

Plaintiff has failed to present evidence to support the merits of his Eighth Amendment claims.  To establish a violation under 42 U.S.C. § 1983, a plaintiff can show that the defendant acted with "deliberate indifference to serious medical needs." *Watkins v. City of Battle Creek,* 273 F.3d 682, 685 (6th Cir. 2001) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (holding that the Eighth Amendment forbids prison officials from "unnecessarily and wantonly inflicting pain" on an inmate by acting with "deliberate indifference" toward the inmate's "serious medical needs") (also noting that pretrial detainees have a Fourteenth Amendment Due Process right to adequate medical treatment that is analogous to the Eight Amendment rights of prisoners)).

A deliberate indifference claim has both objective and subjective components. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Phillips v. Roane Cty., Tenn.*, 534

31

F.3d 531 (6th Cir. 2008). The objective component requires a "sufficiently serious" medical need. *Farmer,* 511 U.S. at 837. Most circuits hold that a medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* However, the "obviousness" of a prisoner's medical needs "may *also* be decided by the *effect* of delay in treatment. *Id.* (internal quotation marks and citations omitted) (noting lines of decision regarding delayed treatment that caused injury or delayed administration of medication).

The subjective component of a deliberate indifference claim requires a "sufficiently culpable" state of mind. *Id.* at 896. A plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." *Comstock v. McCrary,* 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Farmer,* 511 U.S. at 835); *see also Horn v. Madison Cty. Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994) ("Officials may be shown to be deliberately indifferent to such serious needs without evidence of conscious intent to inflict pain."). It is enough to show reckless disregard: "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer,* 511 U.S. at 836. But this means that "[d]eliberate indifference is not mere negligence. Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [a plaintiff's] health and safety." *Phillips,* 534

32

F.3d at 539.  Thus, a "sufficiently culpable" state of mind is one that is, at least, reckless—not necessarily intentional, but not merely negligent.

### a.      Objective component

In the case at bar, Plaintiff has been diagnosed by a physician as mandating treatment for both his ulcerative colitis and his Raynaud's disease.  Specifically, he was diagnosed with colitis in January 2014 and with Raynaud's disease in 2015, and as Defendants point out, he has been provided substantial treatment for both conditions.

The Sixth Circuit recognizes three categories of claims under the objective component: (1) claims that the prisoner did not receive any treatment; (2) claims that the treatment was "so cursory as to amount to no treatment at all;" and (3) claims that despite on-going treatment, the care provided was "so grossly incompetent inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018). Plaintiff's deliberate indifference claims fall under the third category, as he was receiving on-going treatment for his condition.

When a plaintiff claims that the treatment he received was inadequate or unreasonably delayed, he is required to "present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment" and "'medical proof that the provided

treatment was not an adequate medical treatment of [the prisoner's] condition or pain." *Rhinehart*, 894 F.3d at 737. "This will often require 'expert medical testimony … showing medical necessity for' the desired treatment and 'the inadequacy of the treatments' the inmate received." *Id.* (quoting *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017)). "The plaintiff also must 'place verifying medical evidence in the record to establish the detrimental effect' of the inadequate treatment. *Id.* "A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Id.* at 738.

As Defendants correctly state, Plaintiff has failed to present any verifying medical evidence of any harm caused by the treatment Plaintiff received, or any claimed delay in that treatment, and thus Plaintiff has failed to satisfy the objective component; therefore, Defendants NP Liu, Dr. Abdellatif and PA Farris are entitled to summary judgment on Plaintiff's Eighth Amendment claims. *See Rhinehart*, 894 F.3d at 737.

### b.    Subjective component

#### i.    NP Liu

To the extent Plaintiff's Complaint alleges a claim against NP Liu based on the two exhausted grievances filed at JCF, Grievances 0059 and 1207, he is unable to establish that NP Liu violated the Eighth Amendment. A "mere difference of

opinion between the plaintiff and his doctor regarding diagnosis and treatment does not state a claim under the Eighth Amendment." *Selby v. Martin*, 84 F. App'x 496, 499 (6th Cir. 2003) (citing *Estelle*, 429 U.S. at 107; *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).  Although fundamental fairness "mandate[s] that medical care be provided to one who is incarcerated and may be suffering from serious injury," that "is not to say that every request for medical attention must be heeded." *Westlake*, 537 F.3d at 860.

First, Plaintiff complains in Grievance 0059, filed on January 3, 2014, that he has been suffering from "stomach, rectal and anal pain(s), with continuous (at times severe) blood/blood clots in his stool" since August 2013, and he states that he wants to see a specialist.  (DE 26-1 at 23.)  While NP Liu provided medical care to Plaintiff during the August 2013 through December 30, 2013 time frame in the grievance (DE 81-3, ¶¶ 3-15; DE 83 at 30-118), Plaintiff does not allege in his complaint that NP Liu was deliberately indifferent to his serious medical needs during that time period. Indeed, the *only* allegation in Plaintiff's complaint prior to January 2014 is that "Plaintiff first started showing symptoms of colitis [in] August 13 when N.P. Wendy Liu Corizon/MDOC tried to catch [the] illness in the early stages."  (*Id.* ¶ 46.)  This single statement, which identifies an effort *to help* him, fails to allege a claim against NP Liu for deliberate indifference, and I will only consider the claims actually made in Plaintiff's Complaint regarding NP Liu.  Plaintiff is "the master of his compliant,"

and thus, the Court looks to the pleadings to define his claims. *Roddy v. Grand Trunk W. R.R., Inc.*, 395 F.3d 318, 322 (6th Cir. 2005).

Second, Plaintiff complains in Grievance 1207 that he sent a kite to healthcare on May 15, 2014 requesting renewal of medication and his bathroom detail, and that the May 16th kite response was only that he would have an appointment with the medical provider in about a week. (DE 26-1 at 17.) Again, although NP Liu provided medical care to Plaintiff during this time period, the allegations in Plaintiff's complaint regarding these allegations *only* name Defendant Xue and fail to mention NP Liu, or any other person, at all. (DE 1, ¶¶ 60-62.) Accordingly, Plaintiff fails to state a claim against NP Liu based on the allegations in Grievance 1207.

Further, the record evidence establishes that during the fall of 2013, NP Liu treated Plaintiff when he complained of hemorrhoids, reviewed, renewed and adjusted his medications as needed, reviewed his laboratory results, reviewed and adjusted his medical details, and submitted a consultation request for Plaintiff to see a gastroenterologist for "evaluation for colonoscopy/ rectal bleeding." (DE 81-3, ¶¶ 3-15; DE 83 at 31-118.) That 407 request was subsequently denied by Dr. Steven Bergman because he determined that "[m]edical necessity is not demonstrated at this time" and he recommended to "treat hemorrhoids and monitor on site." (DE 83 at 71.) Further, during the April through May 2014 time period, NP Liu continued to

36

evaluate Plaintiff, followed the gastrointestinal specialist's recommendations, ordered labs and other diagnostic tests, ordered and renewed medications, including Norco, and Plaintiff had another colonoscopy which revealed only mildly active ulcerative colitis. (DE 81-3, ¶¶ 34-35, 38-39, 40-42, 44-46; DE 83 at 405-07, 410-511.) Plaintiff offers no evidence to dispute this. NP Liu thus pursued "a competent and conscientious course of medical treatment, and [Plaintiff's] dissatisfaction with his treatment does not state a claim under the Eighth Amendment." *Selby*, 84 F. App'x at 499 (citing *Estelle*, 429 U.S. at 107; *Westlake*, 537 F.2d at 860 n.5).

Even if Plaintiff would have preferred a referral to a specialist sooner, this does not mean that his medical treatment was "so woefully inadequate as to amount to not treatment at all." *Colwell v. Corizon Healthcare Inc.*, No. 11-cv-15586, 2014 WL 6686764, at *4 (E.D. Mich. Nov. 26, 2014) (citing *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)) (internal quotation marks omitted). Instead, in evaluating an Eighth Amendment claim, courts "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received *inadequate* medical treatment." *Id.* (emphasis added). When a prisoner claims his care was inadequate, "[c]ourts are generally reluctant to second guess the medical judgement of prison officials." *Id.* (recognizing a narrow exception for cases where medical treatment was "so woefully

inadequate as to amount to no treatment at all"). Therefore, NP Liu is entitled to summary judgment on Plaintiff's Eighth Amendment claims against her.

Further, to the extent Plaintiff's Complaint alleges that NP Liu was "negligent" (DE 1, ¶¶ 169-70), that claim fails. As Defendants correctly state, a negligence claim against a medical provider such as NP Liu sounds in medical malpractice, and is governed by MCL 600.2912, *et seq.* (DE 81 at 38 n.7.) *See also Estelle*, 429 U.S at 106 (stating that mere negligence in diagnosing or treating a medical condition does not state a valid Eighth Amendment claim). Pursuant to MCL 600.2912d, a plaintiff who brings a medical malpractice claim must include with his complaint an affidavit of merit signed by a health professional, attesting to the defendant's failure to meet the standard of patient care. Federal courts have held that dismissal is appropriate when a plaintiff fails to comply with this requirement. *See Alexander v. Fillion*, No. 2:16-cv-64, 2017 WL 6887038, at *4 (W.D. Mich. Oct. 18, 2017) (citing *Briggs v. Burke*, No. 15–2282, at 7 (6th Cir. July 29, 2016) (unpublished) (holding that the dismissal of an inmate's medical malpractice claim was appropriate because he failed to include a health care professional's affidavit with his complaint as required by MCL § 600.2912d); *Raper v. Cotroneo*, 2017 WL 4173507, at *4 (W.D. Mich. Sept. 21, 2017) (dismissing an inmate's medical malpractice claim because he failed to comply with Mich. Comp. Laws §§ 600.2912b and 600.2912d); *Boone v. Heyns*, 2017 WL 3977524, at *4 (E.D. Mich.

Sept. 11, 2017) (dismissing an inmate's negligence, medical malpractice, and intentional infliction of emotional distress claims because he failed to comply with MCL §§ 600.2912b and 600.2912d); *Simmons v. Rogers*, 2017 WL 1179376, at *5 (W.D. Mich. Mar. 30, 2017) (dismissing an inmate's gross negligence claim that sounded in medical malpractice because he did not file an affidavit of merit as required by Mich. Comp. Laws § 600.2912d)), *report and recommendation adopted by* 2018 WL 354533 (W.D. Mich. Jan. 9, 2018).  Because Plaintiff failed to provide an affidavit of merit signed by a nurse practitioner with his pleadings, NP Liu is entitled to summary judgment on Plaintiff's negligence claim against her.  *See Nippa v. Botsford Gen. Hosp.*, 257 Mich. App. 387, 393; 668 N.W.2d 628 (2003) (in a medical malpractice suit against an institutional defendant based on the alleged negligent conduct of the institution's agents, the plaintiff must submit an affidavit of merit from an expert who specializes or is board-certified in the same specialty or field as the agents accused of negligence); *see also Fineis v. Sienko*, No. 293777, 2011 WL 520262, at *3 (Mich. App. Feb. 15, 2011) (holding that plaintiff's negligence claim against a nurse practitioner fails "because plaintiff did not procure and file an affidavit of merit from a nurse practitioner").

### ii.    PA Farris

Plaintiff claims that PA Farris violated his Eighth Amendment rights by "not treating [his] serious pain and medical needs and not following the outside Dr.'s

orders to give pain medication, and the IV iron infusions requested by outside doctor." (DE 1 ¶ 166.) As found above, Grievance 1489 exhausts Plaintiff's claims against PA Farris regarding his claim that in August 2015 he wanted to be seen by a neurologist, have a CT scan or MRI and effective treatment for numbness, continuous pain and lack of circulation in his left hand, arm and foot. (DE 26-1 at 65.)

PA Farris first evaluated Plaintiff on June 12, 2015, after he began receiving IV infusions of Remicade starting in May 2015, noted that his ulcerative colitis and Raynaud's disease were stable, ordered him to continue with his medications and IV therapy, to increase his fluid intake and activity level, and to kite for medical care as needed. (DE 81-6, ¶ 3; DE 83 at 1196-1202.) PA Farris also noted, with respect to Plaintiff's Raynaud's disease, "intermittent bluish discoloration" on Plaintiff's right upper extremity and "cool to touch and weakness," and thus she ordered a trial on a low dose of Norvasc and TED hose. (*Id.*) She continued to treat Plaintiff and renewed his medical details, supplies and medications through July 21, 2015, and Plaintiff also continued to treat with Dr. Abdellatif. (DE 81-6, ¶¶ 4-6; DE 83 at 1202, 1206-11, 1215-20.) On August 21, 2015, PA Farris scheduled an appointment for Plaintiff to evaluate his hand (DE 83 at 1236-37), and on August 27th, she evaluated Plaintiff's complaints regarding his Raynaud's disease during a scheduled provider visit, increased his dose of Norvasc and ordered a detail for two pairs of

TED stockings, a basin so that he could soak his feet, and medical detail order for tennis shoes.  (DE 81-6, ¶ 7; DE 83 at 1242-45.)

Plaintiff's Response fails to address his allegations against PA Farris  (DE 87), and thus he has waived any opposition to Defendants' arguments regarding this defendant.   There is simply no evidence to support Plaintiff's allegations of deliberate indifference by PA Farris.  To the contrary, she rendered extensive and ongoing care and is entitled to summary judgment.

### iii.    Dr. Abdellatif

Plaintiff claims that Dr. Abdellatiff violated his Eighth Amendment rights because he "did not properly treat Plaintiff for [his] serious medical needs or disabilities by not doing a proper follow up as required by policy[.]" (DE 1, ¶ 167.) As I found above, Grievance 0759 exhausts Plaintiff's claim that Dr Abdellatif did not properly treat Plaintiff for his ulcerative colitis after he returned from an offsite specialist appointment on April 3, 2015 and follow up regarding the new treatment plan/procedure.  And, Grievance 0804 exhausts Plaintiff's claim that Dr. Abdellatif did not properly treat Plaintiff's medical needs in April 2015 regarding his complaints of extreme pain and loss of feeling in his left hand and foot.

However, the record evidence shows that Dr. Abdellatif provided timely and appropriate medical care to Plaintiff.  Specifically, with respect to the relevant time frame, Dr. Abdellatif renewed all of Plaintiff's medications on March 18, 2015, and

prescribed additional medication for Plaintiff's complaint of gastrointestinal pain, adjusted his existing medications and ordered additional blood work on April 1, 2015. (DE 81-5, ¶¶ 3-7; DE 83 at 1125, 1131-45.) Plaintiff had a follow-up appointment with Dr. Wood on April 3, 2015, and then received additional doses of Humira on April 7 and April 14, 2015. (DE 83 at 1146-65.) On April 15, 2015, after noting that Dr. Wood had not yet finalized her report after examining Plaintiff on April 3rd, Dr. Abdellatif initiated a plan to follow up on the status of the report. (DE 81-5, ¶ 8; DE 83 at 1166-67 (noting "the GI specialist didn't finish the report yet, they will send it when it is done.").)

On April 20 2015, Dr. Abdellatif evaluated Plaintiff for complaints of pain in his left hand, and ordered Ultram for his pain, advised him to keep his hand and fingers warm, and instructed him to notify healthcare if his condition changed. (DE 81-5, ¶ 9; DE 83 at 1168.) Plaintiff was noted to be doing better on a follow-up visit on April 22nd. (DE 81-5, ¶ 10; DE 83 at 1171-72.) Then, on May 20, 2015, upon receipt and review of Dr. Wood's final report, which included an "Assessment & Plan" dated 5/17/2018 and which noted that Plaintiff's colitis did not respond to his Humira treatment and recommended Remicade treatment instead, Dr. Abdellatif followed Dr. Wood's recommendations and scheduled Remicade infusions to start on May 27th, after which Humira was discontinued and Plaintiff's Prednisone doses were subsequently tapered. (DE 81-5, ¶¶ 11-15; DE 83 at 1178-80.)

Plaintiff offers no evidence to dispute this record evidence, other than his general disagreement with the course and timing of his treatment. Dr. Abdellatif pursued a "competent and conscientious course of medical treatment, and [Plaintiff's] dissatisfaction with his treatment does not stat a claim under the Eighth Amendment." *See Selby*, 84 F. App'x at 499 (citations omitted). This is plainly not a case "where the complaint alleges a complete denial of medical care," or where the treatment provided was "so woefully inadequate as to amount to no treatment at all." Plaintiff's disagreement with the appropriateness of Dr. Abdellatif's course of treatment simply does not state a claim for violation of the Eighth Amendment, and Dr. Abdellatif is entitled to summary judgment.

## F.    Conclusion

Physicians, nurse practitioners and physician assistants are not guarantors of perfect health or of complete relief from all pain and discomfort in the face of a serious medical condition. The undisputed record here shows that myriad health care professionals provided extensive and ongoing treatment, took Plaintiff's complaints seriously and achieved some level of success. To the extent that Plaintiff exhausted his administrative remedies against Defendants – and he did not as to several of them – he is unable to demonstrate how they, in any manner, violated his constitutional or statutory rights.

Therefore, for the reasons stated above, the Court should **GRANT** Defendants Motion for Summary Judgment. (DE 81.) If the Court adopts this recommendation, there will be no remaining parties or claims for adjudication.

## III. PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).

The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: January 7, 2019

s/*Anthony P. Patti*

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE